702 P.2d 681

**STATE of Arizona, Appellee,**

v.

**Fred REFFITT, Jr., Appellant.**

**No. 6179.**

Supreme Court of Arizona,
En Banc.

July 10, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Robert Golden, Asst. Attys. Gen., Phoenix, for appellee.

John Antieau, Phoenix, for appellant.

HAYS, Justice.

Appellant-petitioner, Fred Reffitt, Jr., (hereinafter appellant) was convicted of second degree murder, A.R.S. § 13–1104, a class-2 felony, and forgery, A.R.S. § 13–2002, a class-4 felony. The jury found that the second degree murder was a dangerous offense. Because appellant committed this dangerous crime while on release from confinement, he was sentenced to life without possibility of parole for 25 years. *See*

A.R.S. § 13–604.01(A). Appellant pleaded guilty to forgery and was sentenced to four years in prison. These sentences were to run concurrently.

Appellant sought post-conviction relief. *See* 17 A.R.S. Rules of Crim.Proc., Rule 32. He claimed that he had been improperly denied good time credits and that, as a result, his previous sentence had expired prior to the time of the instant offenses. He argued, therefore, that imposition of enhanced punishment for committing a dangerous crime while on release from prison was improper. *See* § 13–604.01(A). After an evidentiary hearing, the trial court ruled that appellant's previous sentence had not been miscomputed and denied relief. Appellant seeks review of the denial of his Rule 32 petition. Appellant also appeals from his conviction and sentence for second degree murder. He does not appeal from his conviction or sentence for forgery. This court has jurisdiction. Ariz. Const. art. 6, § 5(3); A.R.S. §§ 13–4031, 13–4035.

## FACTS

On the evening of June 17, 1983, appellant and his wife, Dorothy Reffitt, the victim, were quarreling in their home. The dispute concerned appellant's longstanding drinking problem. Appellant had been drinking that afternoon. He became more intoxicated as the evening progressed, until he was staggering and slurring his speech. This dispute continued periodically throughout the evening, until at one point they were shouting at one another. Several times, the victim asked appellant to leave the house. She had ordered appellant to move out of the house during previous disputes, though later she had always withdrawn this demand.

Joyce McQuillen, a friend of the victim, was staying over at the Reffitt house that night. She last saw appellant and the victim in the dayroom. When she retired at about 11:30 p.m., there was no longer any commotion.

Starting at approximately 2:30 in the morning, appellant made several phone calls to his girlfriend, Shirley Moore, asking her to meet him somewhere. In the first phone call, appellant stated that his wife had become intoxicated and passed out on the bed. In a second call approximately fifteen minutes later, appellant said that he couldn't meet Moore because his wife had unexpectedly awakened. In a third call a short time later, he said that he could meet Moore after all because his wife had again fallen asleep. Appellant and Moore eventually agreed to meet at a Denny's restaurant close to Moore's home at 5:00 a.m.

McQuillan slept soundly until 4:00 a.m. She was then awakened by the presence of appellant at her bedside. Appellant still appeared intoxicated. McQuillan went downstairs to fix some coffee in the dayroom. There, she noticed some reddish stains on the floor. The bedding and pillows had been stripped from the dayroom bed and there were red stains on the mattress. The victim's bloodstained dentures were on a table in this room. McQuillan asked appellant: "What happened here?" Appellant explained that there were bloodstains in the room because his wife had hit him in the face and cut his lip. McQuillan could not, however, see any cut on appellant's lip. Appellant then suggested that McQuillan go back to sleep because his wife would not awaken for several hours. McQuillan also noticed that appellant was washing the dayroom bedding and some towels.

When appellant did not appear at Denny's at the appointed time, Moore returned home. Appellant again called Moore, this time asking her to pick him up in her car. McQuillan was present while appellant pleaded with Moore to pick him up, saying, "Babe, come and get me out of this mess." Moore eventually agreed to pick appellant up.

When McQuillan noticed that the victim was not in her bed, she asked appellant, "Where's Dorothy?" Appellant replied that she had left the house the night before after their quarrel. McQuillan concluded that appellant had killed his wife. She

therefore waited until appellant went into the bathroom and then ran out to the victim's car. As she was driving away, appellant came running out of the house and yelled at her to stop.

Tina Burton was the victim's daughter by a previous marriage. She had moved out of the Reffitt household only a month before. After she had spoken to McQuillan that morning, she suspected that appellant had murdered her mother. She decided to drive to the Reffitt home. She saw appellant standing at an intersection near the house, where he was waiting for Moore to pick him up. She asked appellant where her mother had gone. Appellant replied that he didn't know and that he was looking for her. Burton then proceeded to the Reffitt home. After finding dried blood in the dayroom, she left the house. She called the Chandler police and asked for their assistance in searching for her mother. She reported the events of that morning and the previous day. She led the police to the Reffitt house and invited them inside. In the backyard, the police found a trail of blood leading to a storage shed. There, covered with a rug, they found the victim's body. There was evidence that the victim's body had been dragged for some distance. The police left the house without seizing any evidence so they could await issuance of a search warrant.

After obtaining a search warrant, the police searched the house. The victim apparently died from nine blows to the head. The scalp wounds received by the victim closely conformed to the head of defendant's claw hammer found in the laundry room. The hammer had a small amount of blood on it. In the dayroom, small droplets of blood were found splattered on the walls, the blinds and the ceiling. There were bloodstains on the dayroom bed and the carpet. In the kitchen, blood was also found on the faucet and in the sink. In the laundry room, the police found many recently washed items, including the dayroom bedding, towels and some clothes. Traces of blood were found on some of the washed articles.

The fingerprints obtained from the claw hammer did not, however, belong to appellant or to any of the other persons tested. Fingernail scrapings obtained from appellant did, though, contain blood of the same type as the victim's.

By evening appellant was arrested. He was interviewed at the Chandler Police Department by Officer Owen Bell. Appellant orally waived his *Miranda* rights. He also read and signed a waiver card. He told the police that he had trouble remembering the events of the previous night. He recalled seeing his wife lying in a pool of blood but he "didn't know what he hit her with." Appellant agreed to allow the interview to be tape-recorded. When questioning was resumed after a tape recorder was obtained, appellant was again asked if he could recall hitting his wife. Appellant replied, "vaguely [pause] very vaguely." By the end of the interview, he could no longer recall hitting his wife at all. Rather, he maintained that he awoke from a drunken stupor and found her murdered. He inferred that he killed her because he had been arguing with her before and he was the only person present at the scene. He admitted cleaning up the blood in his home. He also recalled dragging his wife's body out into the backyard, though he couldn't recall where he had left the body.

Appellant also described his marital difficulties with the victim. He swore that he loved her. He also, however, referred to her as a "chronic bitcher." He admitted that there had been few days in the last six months when they did not argue, usually about appellant's habitual drinking. He also suspected that his wife was going to leave him. He admitted writing a letter to the victim the day before the murder. In that letter, he describes the victim's threat to leave him the night before and predicts that he will lose her soon.

At the end of the interview, appellant conceded that the interview had been conducted with his permission, without threats of coercion, and that his statements were correct to the best of his knowledge. Appellant was again interviewed by Officer

Bell the next day. Appellant again waived his *Miranda* rights and told basically the same story as before.

At trial, appellant denied ever admitting to the police that he recalled hitting his wife. His defense was that someone else had committed the murder. He argued that the unknown fingerprints on the murder weapon belonged to the real assailant. The jury found appellant guilty of second degree murder.

## I. DID APPELLANT'S ILLEGAL ARREST TAINT HIS CONFESSION?

After searching the Reffitt home, the police sought to arrest appellant. They contacted Shirley Moore. She told the police that she had driven appellant to a detoxification center early in the morning. Around noon, she picked up appellant from the center and drove him to a fast food restaurant for a meal. Because appellant complained that he was tired, she drove to a motel. She paid for a motel room and left appellant there. Moore later led the police to this same room. After determining that this motel room was registered in Moore's name, the police decided to enter and arrest appellant. The police cleared the adjacent poolside area. Moore asked the police if she could enter the room and bring appellant out to be arrested. She feared that he would be harmed or at least startled by the police entry. The police refused Moore's suggestion. They feared that appellant might take Moore hostage or violently resist when threatened with arrest.

The police obtained a motel passkey from the manager and opened the door. The door was still secured from the inside by a chain lock. The police broke the chain lock and two officers entered the room with guns drawn. Both officers identified themselves as police and one officer held up his badge. They told appellant not to move. Appellant sat up in the bed and appeared confused. He was naked, though covered by a blanket. He told the police that he wouldn't move. Three other officers entered the room. Appellant was handcuffed, dressed, and taken to the Chandler Police Department. Approximately one and one-half hours after his arrest, and after receiving his *Miranda* rights, appellant was interviewed by the police. Although evidence was seized pursuant to the police entry, the state did not seek to introduce this evidence at trial. There is no allegation or evidence that the seized evidence was brought to appellant's attention in eliciting the confession and its probative value appears marginal at any rate.[1]

The trial court ruled that appellant's arrest was illegal. Because the state does not contest this ruling on appeal, we may assume *arguendo* that this is true. The trial court determined, however, that appellant's confession need not be suppressed because the taint of the confession was sufficiently purged to allow its admission. Appellant asserts that his confession should have been suppressed. We disagree.

The exclusionary rule bars the admission of verbal statements which constitute the fruit of an illegal arrest. *See Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 454 (1963). A confession obtained through custodial interrogation after an illegal arrest is not inadmissible merely because it would not have come to light but for the illegal police conduct. *Id.* at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455. Rather, the controlling inquiry is whether the accused's confession was procured by "exploitation" of the illegal arrest. *Id.* Differently stated, the question is whether there was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.* This focus on the causal connection between the illegality and the confession reflects two policies underlying the exclusionary rule:

---

1. A pair of women's panties was found under the bed. It appears that they were left there by another motel customer. There is no evidence that appellant was aware they were under the bed. A washcloth with blood on it was also seized. Its relationship to the present case is also unexplained.

When there is a close causal connection between the illegal seizure and the confession, not only is the exclusion of evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts.

*Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824, 839 (1979). *See also Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416, 424–25 (1975) (application of the exclusionary rule protects fourth amendment guarantees in two respects: by deterring lawless conduct by police officers and by closing the doors of the federal courts to any use of evidence unconstitutionally obtained); *Wong Sun v. United States, supra,* 371 U.S. at 486, 83 S.Ct. at 416, 9 L.Ed.2d at 454 (policies underlying the exclusionary rule include deterring lawless conduct by federal officers, and closing the doors of the federal courts to any use of evidence unconstitutionally obtained).

■ In determining whether a confession has been purged of the taint of an illegal arrest, a court must proceed on a case-by-case basis,[2] considering many factors, including:

1) the voluntariness of the confession, as a threshold requirement;

2) the temporal proximity between the illegal arrest and the confession;

3) the presence of intervening circumstances; and particularly,

4) the purpose and flagrancy of official misconduct.

*See Taylor v. Alabama,* 457 U.S. 687, 690, 697–98, 102 S.Ct. 2664, 2667, 2671, 73 L.Ed.2d 314, 319, 324 (1982) (in its most recent decision, the members of the Court all agree that these factors are relevant); *Rawlings v. Kentucky,* 448 U.S. 98, 107, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633, 643 (1980). The burden of proving the admissibility of the confession rests with the prosecution. *See Taylor, supra,* 457 U.S. at 690, 102 S.Ct. at 2667, 73 L.Ed.2d at 319.

■ As to the first factor, the state must first prove by a preponderance of the evidence that appellant's confession was voluntary, including a waiver of *Miranda* rights. *Id.* In the present case, appellant orally waived his *Miranda* rights and signed a waiver card before he was asked any questions. After he was asked a few questions, he again orally waived his *Miranda* rights so it could be tape-recorded. At the end of this first interview, he agreed that his statements were voluntary and not the result of threats or coercion. Both at the beginning and the end of the taped portion of this interview, he acknowledged that it was tape-recorded with his permission. The first interview lasted only 30 minutes. He was given several cups of coffee before and during the interview. He told the police that he had not consumed any liquor for approximately 13 hours. He had been to a detoxification center. Immediately after the interview, the police tested appellant twice with a breathalyzer. Both times the instrument detected no alcohol in his blood. The second interview was conducted the following morning, after appellant had a full night's sleep. He again orally waived his *Miranda* rights. The interview lasted for only 30 minutes. There was certainly no abuse of discretion for the trial court to find appellant's confession voluntary. *See State v. Hensley,* 137 Ariz. 80, 87, 669 P.2d 58, 65 (1983).

■ The finding of voluntariness for fifth amendment purposes is, however, only a threshold requirement for admissibility under the fourth amendment. A waiver of *Miranda* rights alone cannot purge the taint of an illegal arrest. *See Taylor, supra,* 457 U.S. at 691, 102 S.Ct. at 2667–68, 73 L.Ed.2d at 318–19 (a waiver of *Miranda* rights three different times before confession insufficient to purge the

---

**2.** "The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse ..., to turn on ... a talismanic test." *Brown v. Illinois, supra,* 442 U.S. at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 427.

taint); *Dunaway, supra,* 442 U.S. at 216–17, 99 S.Ct. at 2259, 60 L.Ed.2d at 838–39 (beyond this mere threshold requirement, the other three factors constitute a test designed to vindicate policies distinctive to the fourth amendment); *Rawlings, supra,* 448 U.S. at 107, 100 S.Ct. at 2562, 65 L.Ed.2d at 838–39 (the voluntariness of the confession, including the waiver of *Miranda* rights, is an important but not dispositive factor in the fourth amendment analysis); *Brown, supra,* 422 U.S. at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 427 (*Miranda* warnings are an important factor in determining whether the confession is obtained by exploitation of an illegal arrest, but they are not the only factor to be considered).

■ As to the second factor, the temporal proximity between the arrest and the confession, appellant was first interviewed approximately one and one-half hours after his illegal arrest. We agree, therefore, that this factor weighs in favor of suppression. *See Taylor, supra,* 457 U.S. at 691, 102 S.Ct. at 2668, 73 L.Ed.2d at 320 (six hours insufficient at least where accused was unrepresented by counsel, questioned several times before he confessed, fingerprinted, and subjected to a lineup); *Dunaway, supra,* 442 U.S. at 218, 99 S.Ct. at 2259, 60 L.Ed.2d at 839 (two hours between illegal arrest and confession insufficient); *Brown v. Illinois,* 422 U.S. 590, 592–95, 95 S.Ct. 2254, 2256–57, 45 L.Ed.2d 416, 420–22 (1975) (two hours between confession and illegal arrest insufficient; questioning began an hour after the illegal arrest). We note, however, that this factor of temporal proximity is scarcely outcome determinative. *Compare Taylor, supra,* with *Rawlings, supra,* 448 U.S. at 108, 100 S.Ct. at 2563, 65 L.Ed.2d at 643–44 (statement made after 45 minutes of illegal detention is admissible due to the unusually noncoercive atmosphere during detention). In fact,

the temporal proximity factor is often the least helpful of the three criteria.

■ As to the third factor, we must consider the presence of any intervening circumstances. We find the existence of probable cause in the instant case to be one such intervening factor that tends to break the chain of causation between the illegal arrest and the confession. Before appellant's arrest, the police plainly had probable cause to arrest him. In the search of appellant's residence, the police uncovered the victim's body, the evidence that the murder occurred at the Reffitt house and the apparent murder weapon. The police knew that appellant had killed a woman seven years earlier under similar circumstances. The police were also aware of the recent marital discord that existed between appellant and the victim. Tina Burton told the police that appellant had once tried to smother the victim with a pillow.

Other courts have considered the existence of probable cause to be an intervening factor. *See Barry v. New Jersey,* 171 N.J. Super. 543, 410 A.2d 259 (1979), *cert. granted,* 84 N.J. 388, 420 A.2d 316 (1980), *rev'd,* 86 N.J. 80, 429 A.2d 581 (1981), *cert. denied,* 454 U.S. 1017, 102 S.Ct. 553, 70 L.Ed.2d 415 (1981) (the Supreme Court denied certiorari, with three justices dissenting[3] in a case holding that probable cause is an intervening factor); *United States v. Maier,* 720 F.2d 978, 980 (8th Cir.1983); *United States v. Manuel,* 706 F.2d 908, 911–12 (9th Cir.1983); *In re R.S.,* 93 Ill. App.3d 941, 49 Ill.Dec. 551, 418 N.E.2d 195 (1981); *People v. Finch,* 86 Ill.App.3d 493, 41 Ill.Dec. 741, 408 N.E.2d 87 (1980); *People v. Emanuel,* 98 Mich.App. 163, 295 N.W.2d 875 (1980); *Commonwealth v. Bogan,* 482 Pa. 151, 393 A.2d 424 (1978); *State v. Lewis,* 19 Wash.App. 35, 573 P.2d 1347 (1978). In particular, courts have found probable cause to be an intervening factor in cases involving warrantless searches of a residence. *See State v.*

---

**3.** We need not reach the question that troubled the three dissenters. In this case, there was probable cause to arrest before the arrest and not simply before the confession. The evidence which gave the police probable cause did not

include the confession. This was not a case in which the police made an illegal arrest and, fortuitously, before the accused's confession, independent evidence was uncovered which gave the police probable cause.

*Thomas,* 405 So.2d 462, 464 (Fla.App.1981); *Thompson v. State,* 248 Ga. 343, 285 S.E.2d 685, 686 (1981); *State v. Ann Marie C.,* 407 A.2d 715, 724 (Me.1979).

The final factor, the purpose and flagrancy of official misconduct, is entitled to special weight. *See Brown, supra,* 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 427 (this factor is "particularly" relevant); *United States v. O'Looney,* 544 F.2d 385, 390 (9th Cir.1976), *cert. denied,* 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976). In all but one of the modern Supreme Court cases which address the question whether a confession has been purged of the taint of an illegal arrest, the police misconduct has been flagrant. In all such cases, the police acted without probable cause in illegally arresting the accused as part of a "[fishing] expedition for evidence in the hope that something might turn up." *Brown, supra,* 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428; *Taylor, supra,* 457 U.S. at 693, 102 S.Ct. at 2668, 73 L.Ed.2d at 321; *Dunaway, supra,* 442 U.S. at 218, 99 S.Ct. at 2260, 60 L.Ed.2d at 840; *Wong Sun, supra,* 371 U.S. at 480–81, 83 S.Ct. at 413–14, 9 L.Ed.2d at 451–52.

 The police actions in this case, even if erroneous and regrettable, did not involve flagrant or purposeful misconduct. Even if we presume that the police were mistaken in not obtaining an arrest warrant, there was evidence that the police erroneously relied upon the apparent acquiescence of Shirley Moore to allow a search of the motel room. Even though Moore may not have had a sufficient relationship with the motel room to consent to a search, *see State v. Lucero,* 143 Ariz. 108, 692 P.2d 287, 288–89 (1984), it does not follow that the police deliberately acted with bad purpose. Although Moore did not have a key to the room, she paid for the room and the room was registered in her name. It is also true that the police failed to knock on the door and announce their presence. *See* A.R.S. § 13–3916. Again, even if we assume the police acted illegally, this was not a "fishing expedition" nor the type of purposeful misconduct decried in *Brown.*

Shirley Moore told the police that appellant's frame of mind that day had been "desperate." While they were driving on the freeway, appellant attempted to commit suicide by throwing himself out of her car. Moore thwarted the suicide attempt by braking the car and pulling off the highway. When Tina Burton led the police to the Reffitt home, she warned the officers that if appellant was in the house he would try to kill them. The police knew that appellant had committed one murder and they suspected that he committed another murder the day before. On this record, we cannot say that the officers' fear that appellant would violently resist or take his own life when threatened with arrest was baseless. Even if the manner of arrest was illegal, it appears that the police acted without conscious wrongdoing and at least made an arguable mistake. The manner of arrest was designed to avoid resistance and was not "calculated to cause surprise, fright and confusion," *Brown, supra,* 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428, to induce appellant to confess.

Courts have been reluctant to suppress confessions if the illegal police arrest or detention was undertaken without bad purpose and involved an arguable mistake. *See Rawlings, supra,* 448 U.S. at 110, 100 S.Ct. at 2564, 65 L.Ed.2d at 645 (where the illegal detention involved what may have reasonably appeared to be an "open question," then the police conduct "does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of [the confession]"); *State v. Washington,* 120 Ariz. 229, 232–33, 585 P.2d 249, 253 (App.1978), *supplemented by,* 120 Ariz. 233, 585 P.2d 253 (App.1978) (where illegal motive was not motivating factor in illegal police action, prophylactic purpose of exclusionary rule is not furthered); *United States v. Manuel, supra,* at 912 (relevant that police conduct was not flagrant or designed to pressure the accused into an unfair confession); *United States v. Martinez-Gonzalez,* 686 F.2d 93, 99 (2d Cir. 1982) (police failure to state their purpose when entering apartment did not involve purposeful misconduct and suppression un-

warranted); *United States v. Preston*, 608 F.2d 626, 634 (5th Cir.1979) (evidence not suppressed where the officer's conduct had an arguable basis); *United States v. O'Looney, supra* (deterence rationale not furthered where detention not motivated by an improper purpose); *United States v. Rodriguez*, 585 F.2d 1234, 1243 (5th Cir. 1978) (lack of flagrant or intentional police misconduct enhances degree of attenuation warranting no suppression of confession); *United States v. Carsello*, 578 F.2d 199, 204 n. 4 (7th Cir.1978) (same holding as *Rodriguez* ); *United States v. Musick*, 534 F.Supp. 954 (D.Cal.1982) (deterrence rationale of exclusionary rule not furthered where police did not act with purposeful misconduct in making illegal arrest of accused in residence); *cf. State v. Kriley*, 114 Ariz. 587, 588, 562 P.2d 1085, 1086 (App. 1977) (where police actions not aimed at exploiting illegal evidence, less reason to suppress evidence).

The cumulative effect of these factors supports the conclusion that the confession was not obtained by exploitation of the illegal arrest. The trial judge heard the evidence and should be accorded some discretion in determining the attenuation of the taint. *See Brown, supra*, 422 U.S. at 604 n. 10, 95 S.Ct. at 2262 n. 10, 45 L.Ed.2d at 427 n. 10 ("Our approach relies heavily, but not excessively, on the 'learning, good sense, fairness, and courage of ... trial judges.' "). The confession was therefore admissible.

## II. DID THE TRIAL COURT ERR IN REFUSING A *WILLITS* INSTRUCTION?

The murder weapon, a hammer that belonged to appellant, was found in the laundry room of the Reffitt home. On the hammer, the police found two latent fingerprints. These fingerprints did not belong to appellant or to any of the ten other persons tested. The police were unable to determine whether these fingerprints belonged to the victim because the only set of fingerprints obtained from the victim were not usable for identification purposes. At trial, the defense requested that the jury be instructed as follows concerning the destruction of this evidence:

> If you find that the State of Arizona has failed to produce evidence from any source that is peculiarly within its power to provide and the contents, nature or quality of that evidence is crucial to the defense, you may presume that because the evidence was not produced, its results would have been unfavorable to the State of Arizona.

*See State v. Willits*, 96 Ariz. 184, 187, 393 P.2d 274, 276 (1964). The court rejected this instruction. Appellant claims this was error. Appellant also objects for the first time on appeal that the failure of the police to obtain fingernail scrapings from the victim also justified the giving of a *Willits* instruction. Appellant argues that the state's failure to obtain these two items prejudice his case because it would have bolstered the theory that he committed the murder in self-defense.

To be entitled to a *Willits* instruction, a defendant must prove that (1) the state failed to preserve material and reasonably accessible evidence that had a tendency to exonerate the accused, and (2) there was resulting prejudice. *See State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984). The trial court's decision to forego a *Willits* instruction for failure to satisfy either or both of the above requirements is not reversible error absent an abuse of discretion. *Id.*

We find no abuse of discretion in refusing this instruction because appellant has failed to make the requisite showing of prejudice. As appellant concedes in his brief (app.'s brief at 5, 18), the only defense pursued at his trial was that someone else murdered the victim. There was no suggestion at his trial that the victim died during mutual combat. There is also no credible evidence [4] to support this theory.

---

4. The only suggestion that there had been mutual combat between appellant and the victim was

appellant's statement to Joyce McQuillan that his wife had hit him in the mouth and cut his

When appellant was arrested, there were no scratches or bruises on his body. In neither of his confessions to the police did appellant even intimate that the killing occurred during mutual combat. Because of the severe arthritis the victim suffered in both of her hands, and the pins holding together the joints in her right hand, there was evidence that it would have been extremely painful for the victim to strike the accused. The evidence suggested that it would have been especially painful for the victim to strike the accused with her right hand and she was right-handed. There was no evidence presented at trial that the victim had ever struck appellant. There was certainly no suggestion that the victim committed suicide.

■ In approving the refusal to give a *Willits* instruction, we have stated that:

Instructions must be predicated on some theory of the case which may be found in the evidence, and, when not so predicated, they should not be given as their tendency would be to mislead the jury.

*State v. Axley,* 132 Ariz. 383, 393, 646 P.2d 268, 278 (1982). Additionally, the trial court only refused the *Willits* instruction after trial counsel conceded that if it were shown that the victim's fingerprints matched the mysterious fingerprints on the hammer, this would not help the defense case. Appellant cannot make a tactical decision not to argue·a defense theory to the jury and then assign this as error on appeal. *See State v. Perez, supra,* 141 Ariz. at 464 n. 6, 687 P.2d at 1219 n. 6. We find no error.

A more serious contention was raised at the trial court level. There, appellant argued that refusal of a *Willits* instruction was error because if the victim's fingerprints had been preserved, the defense could have eliminated the hypothesis that the unknown fingerprints on the murder weapon did not belong to the victim. In this way, appellant argued, the defense the-

ory that someone other than the accused committed the murder would have been bolstered.

Assuming, *arguendo,* that appellant was entitled to a *Willits* instruction on this theory, we fail to find prejudice, because we detect no reasonable possibility that the assigned error contributed to the jury's verdict.

There is no evidence that the hypothesis that the victim's fingerprints were on the murder weapon played a serious role in the case. We note that there was overwhelming evidence of appellant's guilt. *Cf. State v. Soloman,* 125 Ariz. 18, 23, 607 P.2d 1, 6 (1980).

There was also no reason to expect the victim's fingerprints would be on the grip handle of the hammer. The tools belonged to appellant. The gnarled condition of the victim's hands would have made it extremely painful for her to use the hammer. As we have previously noted, there was no evidence of mutual combat between the victim and her attacker. Even if the victim had attempted to fend off blows from the hammer with her hands, these fingerprints would appear somewhere other than on the handle where an assailant would grip it.

Additionally, when the hammer was found by the police, there was very little blood on it. There was expert testimony that there would have been considerably more blood on the hammer if it had been used as the instrument of assault. Appellant admitted that he had cleaned up the blood in the dayroom and moved the body to hide the murder. There was evidence that it is very easy to wipe away fingerprints. Thus, even if the victim's fingerprints had been on the hammer after the attack, there was considerable evidence that they would have been obliterated.

Finally, there is no allegation or evidence that the state acted in bad faith in failing to preserve this evidence. This is not a case in which tests were not performed

lip. Appellant made this statement to explain the blood in the dayroom. In view of the defense theory presented to the jury at trial, that the blood in fact came from the victim, it would

appear that even the defense would concede that this was a misstatement. Certainly, there were no scratches or bruises on appellant which would corroborate the mutual combat theory.

that could have been performed because the state intentionally chose not to do so. *See State v. Hannah,* 120 Ariz. 1, 583 P.2d 888 (1978). Rather, all the evidence suggests the fingerprints were obtained in good faith, but it was discovered too late that they were not usable for identification purposes. We accordingly find no prejudice and no reversible error.

### III. DID THE TRIAL COURT PROPERLY REFUSE TO GIVE A MANSLAUGHTER INSTRUCTION?

Rule 23.3, Arizona Rules of Criminal Procedure, 17 A.R.S., requires that a lesser included offense be submitted to the jury. An instruction on the lesser included offense is proper if the crime is a lesser included offense to the one charged and if the evidence supports the giving of the instruction. *See State v. Noriega,* 142 Ariz. 474, 481, 690 P.2d 775, 782 (1984). Appellant contends that the trial court should have provided a jury instruction on manslaughter as a lesser included offense of second degree murder. Assuming, *arguendo,* that manslaughter is a lesser included offense of second degree murder, we find no error.

First, as appellant concedes in his brief, he personally indicated to the trial judge that he did not want to offer the jury the option of convicting him of manslaughter. Therefore, the failure to give a manslaughter instruction warrants reversal only if it is fundamental error. *See State v. Wussler,* 139 Ariz. 428, 430, 679 P.2d 74, 76 (1984); *State v. Flores,* 140 Ariz. 469, 474, 682 P.2d 1136, 1141 (App.1984).

Second, the evidence does not warrant a manslaughter instruction. To be entitled to a manslaughter instruction in this case, appellant would have had to present evidence of a reckless killing, A.R.S. § 13–1103(A)(1), or killing "upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim." A.R.S. § 13–1103(A)(2). As to heat of passion manslaughter, there was insufficient evidence. As in *State v. Watkins,* 133 Ariz. 1, 4, 648 P.2d 116, 118–19 (1982),

appellant denied killing the victim or claimed an inability to remember the events at the time of the murder. There was a total absence of any evidence that the killing took place in a heat of passion or that there was adequate provocation by the victim. The court did not err in refusing the instruction. *Id. See also State v. Heath,* 122 Ariz. 36, 39, 592 P.2d 1302, 1304 (App. 1979). Although there had been an argument between the accused and the victim on the night before the murder, the quarreling had stopped for some time before Joyce McQuillen retired for the evening. Thus, there was evidence of a sufficient cooling-off period. There was no evidence of any further quarrel between the victim and the accused. There was a complete absence of any evidence that the victim provoked the accused or that they engaged in mutual combat. The accused did not testify at trial. In both of his statements to the police, appellant never intimated that the killing occurred in the heat of passion or immediately after a quarrel. The trial court acted within its discretion in refusing this instruction.

As to reckless manslaughter, we similarly conclude that no instruction was required. In *State v. Watkins,* 126 Ariz. 293, 301, 614 P.2d 835, 842–43 (1980), we reserved the question as to whether evidence of defendant's voluntary intoxication might ever support a reckless manslaughter instruction. In *Watkins,* we concluded that the facts precluded such an instruction. There, the defendant had manifested such an extreme indifference to human life by stabbing the victim four times that an instruction on second degree murder, A.R.S. § 13–1104(A)(3), would be required. *Id.* Surely, by delivering nine blows to the victim's head with a claw hammer, the present facts similarly preclude a reckless manslaughter instruction. We find no error.

### IV. DID THE TRIAL COURT ERR BY REFUSING AN INTOXICATION INSTRUCTION?

Appellant was charged and convicted of causing the death of another per-

son without premeditation "knowing that his conduct [would] ... cause death or serious injury." A.R.S. § 13–1104(A)(2). Appellant contends that an instruction on intoxication should have been given by the trial judge. We disagree. Intoxication is not a defense to crimes that are committed with the "knowingly" *mens rea. See* A.R.S. § 13–503; *State v. Ramos,* 133 Ariz. 4, 6, 648 P.2d 119, 121 (1982) (evidence of intoxication allowed to negate the mental state of "intentionally," but not the mental state of "knowingly"); *State v. Neal,* 143 Ariz. 93, 97, 692 P.2d 272, 277 (1984) (first degree murder requires "intentional" or "knowing" *mens rea* on part of assailant and voluntary intoxication only negates "intentional" *mens rea* ).

■ Apparently appellant made a verbal request for this instruction, as no written request appears in the record. As indicated by the cases cited above, there was no reason to give the requested instruction because appellant's voluntary intoxication could not be used to negate his culpable mental state of "knowingly."

We also note that appellant's defense at trial was that someone other than himself had killed his wife; hence, his state of intoxication was not of such import as to require an instruction.

## V. DID THE JURY INSTRUCTIONS IMPROPERLY SHIFT THE BURDEN OF PROOF TO THE ACCUSED?

The trial court instructed the jury with the following definitions of "dangerous instrument" and "knowingly":

The crime of murder in the second degree requires proof ... [that] the defendant knew that his conduct would cause death or serious physical injury.

As used in these instructions, *"knew"* or *"knowingly"*, means that a person is aware or believes that his conduct is of that nature *or that the circumstances exist.*

....

a *dangerous instrument* means anything that under the circumstances in which it is used, *is readily capable of causing death or serious physical injury.*

Both of these definitions are in accord with the statutory definitions. *See* A.R.S. §§ 13–105(5)(b) ("knowingly") and 13–105(7) ("dangerous instrument"). Appellant contends that these instructions shifted the burden of proof to the defense to prove these elements of the charged crime. We disagree.

It is difficult to see how the challenged instructions create presumptions shifting the burden of proof to appellant because they function as mere definitions of legal terms of art. All of the cases cited by appellant involve jury instructions that create presumptions. *See Sandstrom v. Montana,* 442 U.S. 510, 513, 99 S.Ct. 2450, 2453, 61 L.Ed.2d 39 (1979) (presumption that "a person intends the ordinary consequences of his voluntary acts"); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 1882–83, 44 L.Ed.2d 508 (1975) (presumption that defendant committed homicide unless he can prove the killing was committed "in the heat of passion on sudden provocation" to reduce the crime to manslaughter); *State v. Mincey,* 130 Ariz. 389, 396, 636 P.2d 637, 644 (1981) (presumption similar to *Sandstrom* ); *State v. Platt,* 130 Ariz. 570, 573, 637 P.2d 1073, 1077 (1981) (presumption that exhibition of article fashioned to appear dangerous or deadly in robbery is evidence of its dangerous or deadly character).

■ Factually, it is also difficult to understand appellant's complaint in this case. At trial, appellant did not deny that his wife was killed with a hammer. He only argued that the crime was committed by someone else, the person whose fingerprints appeared on the murder weapon. A hammer obviously qualifies as an instrument of assault that is "capable of causing death or serious physical injury." We find no error as to the definition of "dangerous instrument."

As to the definition of "knowingly," appellant has presented no argument that he

failed to knowingly commit this crime, other than his intoxication at the time of the crime, which we have already rejected as a defense.

Appellant has utterly failed to demonstrate how the challenged instructions shift the burden of proof to the defense on any issue. We find no error.

### VI. WAS APPELLANT'S PREVIOUS SENTENCE IMPROPERLY EXTENDED TO ALLOW ENHANCED PUNISHMENT PURSUANT TO A.R.S. § 13–604.01(A)?

#### (A) Was the Expiration Date of Appellant's Previous Sentence Miscomputed?

Appellant committed the present offense on June 18, 1983. Appellant sought in a Rule 32 hearing to prove that his previous sentence had expired before this time, so that application of A.R.S. § 13–604.01(A) was improper. After an evidentiary hearing, the trial court determined that appellant's release date was on June 22, 1983. Therefore, the court concluded that application of enhanced punishment for committing a dangerous offense while on release from confinement was proper. *See* A.R.S. § 13–604.01(A).

■ Appellant contends that the release date was 15 days earlier, on June 7, 1983. We shall focus on the disagreements between appellant and the trial court in their computations. Appellant asserts that he went A.W.O.L. from work furlough on July 30, 1980, which terminated appellant's right to good time credits. *See* A.R.S. § 31–252 (double time). The trial court found that appellant went A.W.O.L. on July 15, 1980, thus adding 15 days to the mandatory release date. Appellant admit-

ted that, on July 14, 1980, he took an automobile, which he was authorized to use only in Tucson, to Casa Grande and demolished the car. The trial court found that appellant violated a term of his release by engaging in the unauthorized use of a motor vehicle. Also on this date, appellant's employer reported that appellant did not report to work. There was substantial evidence to support the trial court's determination that appellant was A.W.O.L. on July 15, 1980. We find no error.

#### (B) Was Appellant Improperly Denied "Double Time" Credits (Former A.R.S. § 31–252) For Time Spent While on Mandatory Release?

■ Appellant was not awarded "double time" credits (former A.R.S. § 31–252) [5] for time spent on mandatory release (A.R.S. § 31–411). The trial court found that this was proper. We agree. For the reasons stated in *State v. Robertson*, 131 Ariz. 73, 638 P.2d 740 (App.1981), *review denied*, we conclude that double time credits were not awardable. *See also State v. Thomas*, 131 Ariz. 547, 550, 642 P.2d 892, 895 (App.1982), for this same holding. We find no error in the computation of appellant's sentence. Therefore, imposition of enhanced punishment pursuant to A.R.S. § 13–604.01(A) was also proper.

### VII. WAS APPELLANT DENIED EFFECTIVE ASSISTANCE OF COUNSEL?

Appellant contends that he did not receive effective assistance of counsel at trial. This issue was not addressed in his Rule 32 hearing, nor was it specifically raised in his petition for post-conviction relief.[6] Appellant asserts that counsel failed to interview witnesses, failed to allow ap-

---

5. Repealed by Laws, 1977, Ch. 142, § 182. For a comparison of the old and new Code provisions, *see State v. Valenzuela*, 144 Ariz. 43, 45–46, 695 P.2d 732, 734–35 (1985).

6. The only specific allegation of incompetency of counsel mentioned in the petition for post-conviction relief concerns counsel's failure to object to the computation of appellant's sentence at the sentencing hearing. No evidence

was adduced at the Rule 32 hearing concerning this or any other alleged act of incompetent representation. As to the failure to object to the computation of appellant's sentence, we find that appellant's sentence was not miscomputed. We similarly find no incompetent representation, because no prejudice has been shown by the failure to object. *See State v. Lee*, 142 Ariz. 210, 689 P.2d 153 (1984).

pellant to meaningfully assist in his own defense, and failed to adequately test the state's case. Before trial, appellant filed several motions for change of counsel. He also made several phone calls to trial counsel's superiors at the office of the Public Defender complaining about his attorney's performance. Appellant withdrew his motion for change of counsel before trial. He personally indicated to the trial judge that counsel had conducted the interviews he had requested and that he had seen transcripts of these interviews. He now claims that trial counsel was prejudicially incompetent.

Many of appellant's allegations of ineffective assistance of counsel concern off-the-record matters that are evidenced solely by his affidavit incorporated as an appendix to his brief. Although appellant was assisted by advisory counsel in this *pro per* appeal, appellate counsel did not make any "substantive changes" to the brief, including its statement of facts. The self-serving [7] affidavit of an accused about issues presented for the first time on appeal does not constitute a sufficient factual basis for appellate review. *See State v. Goswick*, 142 Ariz. 582, 585, 691 P.2d 673, 676 (1984); *State v. Kruchten*, 101 Ariz. 186, 189, 417 P.2d 510, 513 (1966).

To consider such factually untested allegations on appeal which have not been previously raised below, would not only encourage circumvention of the normal procedure for appellate review, but it would also be unfair to trial counsel. *See State v. Zuck*, 134 Ariz. 509, 515, 658 P.2d 162, 168–69 (1982) (refusal of court to consider

allegations of attorney incompetence on appeal without a prior hearing on the issue).

Because appellant has not previously raised this contention below, we shall not address it on appeal. Nor shall we remand this case for a hearing. *See State v. Goswick, supra.* This is not a case in which the accused's Rule 32 petition was summarily denied by the trial court without a hearing. *See State v. Bernal*, 137 Ariz. 421, 425, 671 P.2d 399, 402–03 (1983); *State v. Carriger*, 132 Ariz. 301, 305, 645 P.2d 816, 820 (1982). Nor is it apparent from the record alone that a remand is appropriate. *See State v. Zuck, supra.* The accused is free to petition for a Rule 32 hearing to adduce evidence to support these allegations. *See State v. Goswick, supra.* We find no error.

We have reviewed the record for fundamental error. A.R.S. § 13–4035; *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969). We have found none in this case.

Judgments of conviction and sentences affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.

---

[7]. Not only are appellant's allegations regarding ineffective assistance of counsel self-serving, they are also not entirely consistent. In his brief to this court, appellant alleged that trial counsel failed to interview "in this case, *all* ... witnesses." In his notice of "errata" in his brief, appellant concedes that trial counsel interviewed "one or two witnesses." No reason is cited for this change in appellant's story. Furthermore, we note that appellant personally indicated to the trial judge that his attorney had interviewed the witnesses that he had requested.