NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

TIMOTHY MICHAEL REILLY, *Appellant*.

No. 1 CA-CR 19-0123
FILED 12-12-2019

Appeal from the Superior Court in Maricopa County
No. CR2018-123510-001
The Honorable Annielaurie Van Wie, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Lawrence S. Matthew
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Michael J. Brown joined.

**W I N T H R O P**, Judge:

¶1        Timothy Michael Reilly ("Appellant") appeals his convictions and sentences for burglary in the second degree and false reporting to a law enforcement agency.  Appellant's counsel has filed a brief in accordance with *Smith v. Robbins*, 528 U.S. 259 (2000); *Anders v. California*, 386 U.S. 738 (1967); and *State v. Leon*, 104 Ariz. 297 (1969), stating he has searched the record for error but has found no arguable question of law that is not frivolous.  Appellant's counsel therefore requests that we review the record for fundamental error.  *See State v. Clark*, 196 Ariz. 530, 537, ¶ 30 (App. 1999) (stating that this court reviews the entire record for reversible error).  This court allowed Appellant to file a supplemental brief *in propria persona*, and he has done so, raising issues that we address.

¶2        We have appellate jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and 13-4033(A).  Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

¶3        A grand jury issued an indictment charging Appellant with Count I, burglary in the second degree, a class three felony, and Count II, false reporting to a law enforcement agency, a class one misdemeanor.  *See* A.R.S. §§ 13-1507, -2907.01.  The State alleged the existence of seven non-dangerous historical prior felony convictions and numerous aggravating circumstances.

¶4        Before trial, Appellant's counsel sought a competency determination, *see* Ariz. R. Crim. P. ("Rule") 11, and the parties stipulated to a determination of competency based on the examinations and reports of two licensed clinical psychologists.  The trial court subsequently found Appellant competent to proceed.

¶5        At trial, the State presented the following evidence:  At approximately 11:55 p.m. on May 11, 2018, Officer Fluellen of the Scottsdale Police Department and his partner responded to the report of a burglar alarm at the residence of E.M. and T.M. ("the homeowners") in Scottsdale.  The officers arrived at the home, but received no response to a knock on the

---

[1]        We view the facts in the light most favorable to sustaining the verdict and resolve all reasonable inferences against Appellant.  *See State v. Kiper*, 181 Ariz. 62, 64 (App. 1994).

door, observed no lights on inside the home, and found no signs of forced entry during a cursory check of the home's perimeter, although the officers were unable to access any rear entry points to the home. The officers concluded the call was a false alarm.

¶6          A few hours later, at approximately 6:56 a.m. on May 12, another alarm triggered at the home, and Officer Johnson responded soon thereafter. Outside the residence, Officer Johnson spoke with the homeowners' daughter, who had arrived shortly before the officer and advised him that the homeowners were out of town. The officer also noticed a bicycle that appeared to be out of place because there were no other vehicles around, and the daughter confirmed the bicycle did not belong to the homeowners. Officer Johnson called for backup.

¶7          Additional police officers arrived and set up a perimeter around the residence. Officer Johnson, along with Officer Good and Sergeant Stumpf, entered the house and began clearing it room by room. The officers discovered Appellant in the master bedroom, where they observed numerous items piled on the bed, including jewelry, loose coins, and collector coins that were later determined to belong to the homeowners. A jewelry chest on the side of the bed had been opened, and numerous drawers in the room had been pulled out. The officers also found money that belonged to the homeowners on Appellant's person. Additionally, Appellant had rings that did not fit his fingers on both his left and right hands, as well as a bracelet on his left wrist. T.M. later confirmed that the jewelry belonged to her.

¶8          Officer Johnson noticed that an approximately two-foot by three-foot hole had been cut in the bedroom wall next to the pool room. The officers saw drywall chunks and dust on the floor near the hole. Although all other doors in the house were locked when the officers arrived, the sliding glass door to the pool room was unlocked and large umbrellas had been opened and placed in front of the sliding glass door in a manner that obstructed the view of the interior of the pool room. Additionally, several motion sensors in the home had been pulled down and the wires disconnected.

¶9          Appellant appeared extremely grungy and had drywall dust on his shirt. His speech was slow, thick, and deliberate, and he mumbled and slurred his words, while spitting and hacking. He also appeared lethargic and was sweating profusely. He told the officers the home belonged to his sister and that he had been packing. He had no identification on his person, and when asked his name, he identified

3

himself as "Steven Michael Antwil" and claimed his birth date was December 12, 1979. Another officer who arrived at the scene recognized him, however, allowing the police to eventually ascertain his true name and date of birth—January 25, 1982.

¶10        When E.M. returned to the home to repair it and place things back in order, he discovered some items that did not belong to either of the homeowners. These items were turned over to the police, and included a key chain with several silver keys, another key with filed-down teeth, two phones, a knife with drywall residue on it, and a bus pass dated May 11, 2018.

¶11        The homeowners' daughter testified that, on May 11, she was contacted by the alarm company, which informed her the sensors in the poolroom had gone off. She arrived at the residence after midnight, but the police had already been there, and she left. She returned approximately seven hours later after she was notified the sensor in the master bedroom had gone off. She had last been at the home a few weeks earlier and had checked all the rooms and made sure everything was locked. Neither the daughter nor the homeowners had ever met Appellant, much less given him permission to enter the home, wear T.M.'s jewelry, or take items from the home.

¶12        The jury found Appellant guilty of both counts as charged. The jury also found the existence of three aggravating circumstances: (1) the offense caused physical, emotional, or financial harm to the victim(s); (2) the offense involved the taking of or damage of property in an amount sufficient to be an aggravating circumstance; and (3) Appellant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. Appellant then admitted having seven prior felony convictions.

¶13        At sentencing, the court sentenced Appellant as a category three offender to the presumptive term of 11.25 years' imprisonment for Count I, with credit for 277 days of presentence incarceration. For Count II, the court entered a terminal disposition, sentencing Appellant to six months' incarceration in the county jail, while crediting him for time served. Appellant filed a timely notice of appeal.

**ANALYSIS**

¶14        Appellant raises several issues in his supplemental brief. We address each of Appellant's arguments.

## I.    Appellant's Request for a <u>Willits</u> Instruction

**¶15**         Appellant argues the trial court should have instructed the jury pursuant to *State v. Willits*, 96 Ariz. 184 (1964).  He argues that he "requested a *Willits* instruction due to evidence of a previous breach of the home which went unexplained[, and a]ll contents of [the] home were not provided to the defense for independent analysis."

**¶16**         In this case, at the October 19, 2018 pretrial settlement conference, Appellant himself posited a theory that the earlier alarm may have been caused by someone else breaking in, and he noted that the police had turned the items found on the bed over to the homeowners.  He then argued that "my team never had a chance to do any testing on any of that stuff to determine if the people that came into the home the previous evening could have had something to do with that or played a part in any of that stuff."  After further discussion, he stated, "[F]or some reason I'm drawn to the concept of a [*Willits*] instruction.  I mean, who's to say that the damage and the things piled on the bed were mine . . . ?"  At a subsequent settlement conference/final trial management conference held January 7, 2019, Appellant again broached the subject of a *Willits* instruction, asking, "[I]sn't there like breathing room for a [*Willits*] instruction?  This stuff was all given back to the homeowner without fingerprints or any independent testing being done. . . .  So how can the Prosecution accuse me of being the one who put the stuff on the bed?"  At trial, the trial court did not provide the jury with a *Willits* instruction.

**¶17**         A *Willits* instruction tells jurors they may infer from the State's loss or destruction of material evidence that the evidence would have been unfavorable to the State.  *See State v. Fulminante*, 193 Ariz. 485, 503, ¶ 62 (1999).  Nevertheless, a defendant is not automatically entitled to a *Willits* instruction based on destruction or non-retention of evidence.  *State v. Murray*, 184 Ariz. 9, 33 (1995).  "To be entitled to a *Willits* instruction, a defendant must prove that (1) the state failed to preserve material and reasonably accessible evidence that could have had a tendency to exonerate the accused, and (2) there was resulting prejudice."  *State v. Smith*, 158 Ariz. 222, 227 (1988) (citation omitted).  To show evidence had a "tendency to exonerate," a defendant cannot simply speculate about how the evidence may have been helpful.  *State v. Glissendorf*, 235 Ariz. 147, 150, ¶ 9 (2014) (citations omitted).  Instead, "there must be a real likelihood that the evidence would have had evidentiary value."  *Id.* (citations omitted).  Further, *Willits* only provides for a duty to preserve evidence, not create it, and such an instruction is not called for merely because a more exhaustive

investigation might have been made. *See generally State v. Walters*, 155 Ariz. 548, 550-51 (App. 1987).

**¶18**        Here, Appellant does not argue, much less show, that the defense requested the items found on the bed be turned over for analysis. Moreover, even had those items been tested and fingerprints or DNA from the homeowners, their daughter, or other persons been found to exist, Appellant does not argue or show how such information would have been relevant, much less potentially exculpatory, and fails to show that the State's failure to either test the items or turn them over for testing by the defense prejudiced him in any way. *See State v. Bolton*, 182 Ariz. 290, 308-09 (1995); *State v. Reffitt*, 145 Ariz. 452, 462 (1985). On this record, there is no indication the State lost, destroyed, or failed to preserve material evidence, and the court did not reversibly err by declining to give a *Willits* instruction on this basis.

*II.        The State's Alleged Failure to Turn Over a Video*

**¶19**        Appellant also contends the May 11 bus pass found by the homeowner led the State to subpoena Valley Metro — the bus company — for video surveillance that might link Appellant's whereabouts at the time of the first alarm to the area near the homeowners' house. He claims that any video obtained was "never provided as discovery" and "never surrendered to the defense."

**¶20**        The record is unclear whether the State ever actually obtained the surveillance video Appellant alleges it sought and, if so, whether the video might have contained footage of Appellant. Appellant does not actually claim the defense ever sought to obtain a copy of the alleged video, and he does not explain how the video, if it exists, is potentially exculpatory. He does, however, claim that "[s]aid video clearly depicts [Appellant] in possession of the jewelry the homeowner implied came from her home," indicating an apparent argument that T.M. may have misidentified one or more of the items of jewelry as belonging to her.[2]

**¶21**        But even assuming *arguendo* that the alleged video does exist and shows what he claims, it would still not be potentially exculpatory. Appellant was found by police officers in the homeowners' home, without the homeowners' permission, standing near a recently created hole in the

---

[2]        Appellant does not explain how he knows what the alleged video shows despite his claim that "the video was never surrendered to the defense."

wall and covered in drywall dust, and in possession of a knife with drywall residue on it and numerous items belonging to the homeowners. Moreover, he lied about his identity when questioned by the police. The evidence against Appellant is so strong that any alleged error due to claimed misidentification of one or more items of jewelry cannot be said to have affected the jury's verdict. *See generally State v. Laird*, 186 Ariz. 203, 206 (1996) (finding the evidence so strong, and the defense so incredible, that the court could say with certainty that the defendant was not denied a fair trial); *Reffitt*, 145 Ariz. at 462 (concluding that, even if the appellant had been entitled to a *Willits* instruction, he was not prejudiced because there existed "no reasonable possibility that the assigned error contributed to the jury's verdict"). Appellant has not shown that the evidence he seeks would have been helpful to his defense, *see State v. Miller*, 108 Ariz. 441, 444 (1972), and we find no error, much less fundamental error.

### III. *Alleged Prosecutorial Misconduct*

**¶22** Appellant also argues the prosecutor committed misconduct because she withheld the alleged video from the bus stop and ostensibly suborned perjury by allowing T.M. to testify that the jewelry discovered on Appellant's person belonged to her.

**¶23** "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that '(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial.'" *State v. Moody*, 208 Ariz. 424, 459, ¶ 145 (2004) (citation omitted).

**¶24** As we have noted, even if we assume *arguendo* that Appellant's unsupported claims are true, no reasonable likelihood exists that any alleged misconduct could have affected the jury's verdict.

### IV. *Alleged Ineffective Assistance of Counsel*

**¶25** To the extent that Appellant's arguments implicate a claim that his trial counsel provided him with ineffective assistance, we do not address that aspect of his arguments. Any argument challenging the effectiveness of trial counsel on direct appeal must be brought through Rule 32 proceedings. *See State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9 (2002).

### V. *Presentence Incarceration Credit*

**¶26** Our review of the record indicates Appellant should have received 276 days of presentence incarceration credit for Count I, not 277

days.  However, the State has not filed a cross-appeal, and relying on *State v. Dawson*, 164 Ariz. 278, 286 (1990), we do not correct this error.

### VI. *Other Issues*

**¶27**      We have reviewed the entire record for reversible error and find none.  *See Leon*, 104 Ariz. at 300; *Clark*, 196 Ariz. at 537, ¶ 30.  The evidence presented at trial was substantial and supports the verdict. Appellant was represented by counsel at all stages of the proceedings and was given the opportunity to speak at sentencing.  The proceedings were conducted in compliance with his constitutional and statutory rights and the Arizona Rules of Criminal Procedure.

**¶28**      After filing of this decision, defense counsel's obligations pertaining to Appellant's representation in this appeal have ended. Counsel need do no more than inform Appellant of the status of the appeal and of his future options, unless counsel's review reveals an issue appropriate for petition for review to the Arizona Supreme Court.  *See State v. Shattuck*, 140 Ariz. 582, 584-85 (1984).  Appellant has thirty days from the date of this decision to proceed, if he desires, with a *pro per* motion for reconsideration or petition for review.

## CONCLUSION

**¶29**      Appellant's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA

8