IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

———————————————

THE STATE OF ARIZONA,
*Appellee,*

*v.*

TITO RENE SCOTT,
*Appellant.*

No. 2 CA-CR 2021-0056
Filed June 1, 2023

———————————————

Appeal from the Superior Court in Pima County
No. CR20195972001
The Honorable James E. Marner, Judge

**VACATED AND REMANDED**

———————————————

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Tanja K. Kelly, Assistant Attorney General, Tucson
*Counsel for Appellee*

Megan K. Page, Pima County Public Defender
By Michael J. Miller and David J. Euchner, Assistant Public Defenders, Tucson
*Counsel for Appellant*

**OPINION**

Presiding Judge Eckerstrom authored the opinion of the Court, in which Chief Judge Vásquez concurred and Judge Cattani dissented.

E C K E R S T R O M, Presiding Judge:

¶1　　　　Tito Scott appeals from his convictions and sentences for second-degree murder, aggravated assault with a deadly weapon, and discharging a firearm at a nonresidential structure. He argues the trial court erred in denying his motion to suppress a statement he made during a post-indictment, pre-arraignment custodial interrogation. Specifically, he contends the statement was both the fruit of an illegal search and made involuntarily. For the reasons that follow, we vacate Scott's convictions and sentences and remand this matter to the trial court for further proceedings.

**Factual and Procedural Background**

¶2　　　　One evening in August 2019, law enforcement responded to a shooting incident at a Tucson area gas station and convenience store. Shooting victim A.C. and his uncle, A.B., had stopped at the station for gas. Shortly after their arrival, another car pulled into the station. Some of its occupants emerged and walked toward A.C.'s vehicle. After an apparent argument and exchange of gunfire, A.C. sustained two gunshot wounds in his legs. He died from blood loss resulting from those injuries.

¶3　　　　After interviewing Scott and a number of other people about the incident, Pima County Sheriff's Department officers eventually came to suspect Scott was responsible for the shooting. An investigating detective obtained a search warrant to obtain buccal swabs of Scott's DNA. The DNA samples from those swabs matched genetic material found on some of the shell casings collected at the crime scene. Using that DNA evidence, the state obtained a grand jury indictment against Scott. Scott was then arrested, transported to the sheriff's main station, and questioned by the detective. During that interview, Scott confessed that he had shot A.C. but maintained that he had acted in self-defense. Scott was not booked into the jail, nor was he taken to court for an initial appearance before this questioning.

¶4　　　　The trial court suppressed the results of the DNA test after determining the underlying search warrant was obtained with insufficient

probable cause. But the court did not suppress Scott's confession to shooting A.C. After a five-day trial, the jury found Scott guilty of the charges outlined above. The court sentenced him to concurrent terms of imprisonment, the longest of which was fifteen years.

**¶5** This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

**Discussion**

**¶6** On appeal, Scott argues the trial court abused its discretion when it denied his motion to suppress his December 2019 admission that he had shot A.C. As he argued below, Scott contends this statement was a fruit of the illegally obtained search warrant for his DNA. He maintains that, because his confession occurred immediately after being confronted with that evidence, his confession was the direct, unattenuated fruit of the poisonous tree.

**¶7** We generally review a trial court's denial of a motion to suppress for an abuse of discretion. *State v. Sallard*, 247 Ariz. 464, ¶ 7 (App. 2019). A court abuses its discretion when it makes an error of law. *State v. Lietzau*, 248 Ariz. 576, ¶ 8 (2020). However, a "trial court's determination of what constitutes the 'fruit' of the state's 'poisonous tree' is a mixed question of fact and law implicating constitutional questions." *State v. Hackman*, 189 Ariz. 505, 508 (App. 1997) (citing *Ornelas v. United States*, 517 U.S. 690, 696-98 (1996)). As such, we review de novo its conclusions regarding the suppression of evidence. *Id.* Thus, although "we view the evidence and draw all reasonable inferences in favor of upholding the court's factual findings, we are not bound by its legal conclusions." *Id.* at 508-09. And, we consider only the evidence presented at the suppression hearing. *State v. Fristoe*, 251 Ariz. 255, ¶ 2 (App. 2021).

**¶8** In granting Scott's motion to suppress the DNA evidence, the trial court found that the investigating detective had provided a "false statement" on his application for a search warrant. Specifically, the detective had written that "during the many interviews conducted thus far, the name Tito was mentioned a number of times as being the person who shot Anthony." The court found only one of those interviewed had made such a suggestion, and even then it was "at best equivocal" and "unsubstantiated." The court thus concluded the detective had shown "reckless disregard" for accuracy on his sworn application for a search warrant. In accordance with *Franks v. Delaware*, 438 U.S. 154 (1978), the court redacted the false statement from the warrant application and found

that, absent the statement, the warrant was insufficient to support a finding of probable cause. *See also State v. Buccini*, 167 Ariz. 550 (1991). Accordingly, the court granted Scott's motion to suppress "the fruits of the warrant," specifically buccal swabs and a cell phone collected in September 2019.

**¶9**　　　　Scott also maintained that his post-arrest statements should likewise be suppressed as the fruit of the illegally obtained warrant. The trial court rejected this argument, finding that the grand jury indictment was an intervening cause of his arrest and subsequent custodial interrogation. We address that claim more fully here.

**¶10**　　　　The Fourth Amendment to the United States Constitution prohibits the state from using "evidence seized during an unlawful search" as "proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). To deter such conduct, the Supreme Court has required exclusion of evidence obtained "by exploitation of the illegality" of an arrest or search. *Brown v. Illinois*, 422 U.S. 590, 599-600 (1975). This "prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun*, 371 U.S. at 484. The exclusionary rule exists, at least in part, to deter "lawless conduct by" officers. *Id.* at 486. "Although exclusion is not itself a personal constitutional right, it serves to enforce the underlying personal right to be free from unreasonable searches and seizures by deterring violations of the Fourth Amendment." *United States v. Shetler*, 665 F.3d 1150, 1156 (9th Cir. 2011); *see also Davis v. United States*, 564 U.S. 229, 236-37 (2011).

**¶11**　　　　In some cases, however, evidence causally connected to an illegally obtained source may be nonetheless admissible. This can occur when "the connection between the lawless conduct of the police and the discovery of the challenged evidence" is so attenuated as to dissipate the illegality of the officer's conduct. *Wong Sun*, 371 U.S. at 487. The relevant question is "whether, granting establishment of the primary illegality," the objected-to evidence has been acquired "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (quoting John MacArthur Maguire, *Evidence of Guilt* 221 (1959)).

**¶12**　　　　Here, the detective secured Scott's confession by exploiting the illegally seized DNA evidence. During the post-arrest interrogation, Scott persistently denied his presence at the shooting until he was directly confronted with that evidence. Indeed, Scott's first inculpatory statement demonstrates the central role the illegally obtained evidence—which linked

him to shell casings — played in his decision to concede he was at the scene and shot A.C.[1]

¶13  Thus, under the criteria set forth in *Wong Sun*, Scott's confession would be properly categorized as "fruit of the poisonous tree" requiring suppression.  The detective directly marshalled the illegal evidence to secure the confession, and he was rewarded in doing so.  *See Wong Sun*, 371 U.S. at 485 (when defendant makes statement "as a direct result of an unlawful invasion," the "verbal evidence which derives so immediately from an unlawful entry constitutes 'fruit' of official illegality").  As the interrogation demonstrates, the confession was not acquired by means at all "distinguishable" from "the primary taint" under a straightforward application of *Wong Sun*.

¶14  Since *Wong Sun*, the United States Supreme Court has not changed the criteria to determine what evidence should be suppressed as fruit of the poisonous tree.  But it has set forth a framework for evaluating whether evidence has been acquired in a fashion sufficiently distinguishable from the primary taint.  In essence, it has articulated a three-part test for assessing whether the suppression of evidence, causally linked to a prior illegality, would serve the purposes of the exclusionary rule.  *See Brown*, 422 U.S. at 599-600.

¶15  *Brown* instructs us to consider three factors:  (1) "the time elapsing between the illegality and the acquisition of the evidence," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the original official misconduct."  *State v. Solano*, 187 Ariz. 512, 518 (App. 1996) (summarizing the *Brown* factors); *see also Brown*, 422 U.S. at 603-04.[2]

---

[1]Although the interview transcript is not included in the record on appeal, the trial court read into the record this relevant portion.  As read by the trial court, Scott said to the detective:  "You are saying there is ballistics [DNA evidence on shell casings] of me. . . . Correct?  Yes.  Okay.  So now, what if I were to tell you that [A.C.] was the aggressor?"

[2]Some courts have considered voluntariness as a threshold factor the state must clear before it can contend that the causal connection between the illegal conduct and the confession was attenuated.  *See Brown*, 422 U.S. at 604; *State v. Reffitt*, 145 Ariz. 452, 458 (1985).  For the purposes of our analysis as to this claim, we assume that the confession was otherwise voluntary.  *See Solano*, 187 Ariz. at 518 n.1.  In so doing, we recognize that Scott has made a related, but distinct, claim that his confession was involuntary based on his prior interaction with the detective, when Scott

The first two factors concern whether, through passage of time or intervening circumstances, the causal connection between the misconduct and the statement was dissipated or attenuated. *Brown*, 422 U.S. at 603-04.

¶16          Although three months had passed from the time the detective collected Scott's DNA pursuant to an unlawfully obtained warrant, the record shows that very little, if any, time elapsed between the detective's exploitation of the resulting DNA evidence and Scott's incriminating statement.  As the detective himself conceded at the suppression hearing, it was not until he disclosed that Scott's DNA had been found on the shell casings that Scott made any mention of involvement in the shooting.  Thus, the temporal immediacy between the detective's exploitation of the DNA evidence and the confession supports suppression as a remedy.  Notably, the arrest and interrogation of Scott, during which the detective exploited the illegal evidence to secure the confession, constituted that detective's first interaction with Scott after his illegal search of Scott for DNA—and Scott's first awareness that his DNA led to inculpatory evidence.[3]

¶17          The dissent contends that the three-month gap between the illegal search and the confession "weighs against suppression."  It cites a series of cases, all in the context of wrongful arrests.  In those cases, it observes, much shorter time delays attenuated the coercive impact of the wrongful arrest on the defendant's subsequent admissions.  But, in such cases, courts necessarily focus on the psychological impact of the wrongful arrest on the voluntariness of those admissions, an inherently time-sensitive inquiry.

¶18          But here we address whether the state exploited evidence acquired from an illegal search to secure a confession.  That necessarily

had persistently asserted his right to counsel.  Because we vacate Scott's convictions and sentences on the ground that his statement should have been suppressed as the product of illegally obtained evidence, we do not address his claim that the statement was made involuntarily.

     [3]To the extent the dissent suggests *Wong Sun* can be read as holding that a two-day delay attenuates a confession subsequent to an illegal *search*, we do not believe this is a correct reading of *Wong Sun.  See* 371 U.S. at 491 (in context of multiple defendants subjected to both illegal arrests and illegal searches, holding Wong Sun's voluntary confession two days after illegal *arrest* was "not the fruit of that arrest" because "connection between the arrest and the statement" sufficiently attenuated).

requires an assessment of the effect of that evidence on the defendant's decision to confess. Under that analysis, to the extent delay between the events sheds light on whether the state exploited the illegally acquired evidence, the relevant temporal factor must be the time from when the detective made Scott aware of the inculpatory nature of the illegally seized evidence and Scott's decision to confess. Here, there was no delay from which we could conclude the impact of that information was attenuated. Indeed, there was no delay at all.[4] As we discuss below, the state used the time between its illegal search of Scott and his interrogation to conduct a DNA test of the illegally secured sample and leverage it to acquire the indictment, which in turn justified the interrogation in the first instance. Under those circumstances, we cannot characterize the passage of time as attenuating the state's acquisition of the confession.

¶19 Nor does anything in this record suggest any intervening circumstance, independent of the illegality, that dissipated the causal connection between the illegality and Scott's statement. *See State v. Monge*, 173 Ariz. 279, 281 (1992) (following illegal arrest, consent to search not intervening event because consent must be . . . *independent* of the illegal arrest" (quoting *Brown*, 422 U.S. at 603)). Although we agree with the trial court that the grand jury indictment was legally valid despite its reliance on the illegally obtained evidence, *see United States v. Calandra*, 414 U.S. 338, 351-52 (1974), we disagree with the court's suggestion that the indictment therefore qualified as an intervening factor. As the trial court expressly found, Scott's indictment entirely depended on the illegally obtained DNA evidence. *Cf. Utah v. Strieff*, 579 U.S. 232, 240 (2016) ("valid" arrest warrant that "predated" and "was entirely unconnected" to arguably unlawful investigatory stop was sufficient intervening factor to break causal chain). Indeed, until Scott confessed to shooting A.C., it was the state's lone concrete evidence of guilt.

¶20 Therefore, we cannot characterize the indictment as an intervening circumstance. Here, it served only as another mechanism by which the state leveraged the only substantial evidence it possessed: the illegally acquired DNA swab. In fact, that indictment provided the authority for Scott's arrest, which in turn gave the detective the authority to subject Scott to custodial interrogation. Thus, the causal chain connecting the illegal evidence to the December interview was unbroken by any event

---

[4]Regardless of how we weigh this *Brown* factor, it would not control our ultimate conclusion. *See Reffitt*, 145 Ariz. at 459 ("factor of temporal proximity is scarcely outcome determinative").

independent of the illegal search. *See State v. Huez*, 240 Ariz. 406, ¶ 23 (App. 2016) (existence of warrant does not necessarily "'dissipate[] the taint of illegality,' because to hold otherwise would allow police to 'routinely illegally seiz[e] individuals, knowing that the subsequent discovery of a warrant would provide after-the-fact justification for illegal conduct'" (alterations in *Huez*) (quoting *State v. Hummons*, 227 Ariz. 78, ¶ 13 (2011))).

**¶21** The state contends that the last *Brown* factor, "the purpose and flagrancy of the original official misconduct," was insufficient to justify the application of the exclusionary rule. As the United States Supreme Court has repeatedly instructed, "[e]xclusion exacts a heavy toll on both the judicial system and society at large." *Davis*, 564 U.S. at 237. For it to be appropriate, "the deterrence benefits of suppression must outweigh its heavy costs." *Id.* Thus, the "cost-benefit analysis in exclusion cases" should "focus the inquiry on the 'flagrancy of the police misconduct' at issue." *Id.* at 238 (quoting *United States v. Leon*, 468 U.S. 897, 911 (1984)).

**¶22** In those same cases, however, the Court has also held that the deterrence benefit to suppression stands at its apex when, as here, a search warrant issues upon an affidavit that lacks a sufficient foundation for probable cause. *See Leon*, 468 U.S. at 914-15, 923; *Davis*, 564 U.S. at 238.[5] In particular, suppression "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923. Controlling our analysis here, the Court has also indicated that such underlying recklessness supports suppression as a remedy as to the indirect fruits of that misconduct. *Herring v. United States*, 555 U.S. 135, 144 (2009) (in context of *Brown* inquiry, exclusionary rule serves to deter, *inter alia*, reckless underlying conduct).

**¶23** Here, the trial court expressly found that the detective recklessly disregarded the truth in presenting grounds for the search warrant. *See Davis*, 564 U.S. at 238 ("deterrent value of exclusion is strong and tends to outweigh the resulting costs" when police exhibit reckless

---

[5] *Leon* limited application of the exclusionary rule to reject suppression of evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," but expressly withheld from this exception warrants invalidated under *Franks*. 468 U.S. at 922-23.

disregard for Fourth Amendment rights). The record before us amply supports the trial court's conclusion.

¶24 In the affidavit, the detective implied that multiple witnesses had identified Scott as the shooter. But in fact, A.B.—the only eyewitness to identify any specific shooter—had identified that shooter as O.V., who went by the nickname "Tino."[6] No eyewitness had identified Scott as the shooter. And O.V., the lone witness to equivocally suggest that Scott might have been the shooter, himself relied on rumor[7] and, as a suspect himself, had a possible motivation to direct blame elsewhere. The detective also exaggerated the only other evidence linking Scott to the shooting: the GPS evidence indicating that Scott had been in the vicinity of the shooting when it occurred. He omitted from the affidavit that Scott's residence was a couple of blocks away from the shooting.[8] Placed in that proper context, the GPS evidence did little to implicate him in the crime.

¶25 This court can reasonably assume that a homicide detective knows, with some particularity, the strength or paucity of inculpatory facts his investigation has discovered as to his lead suspect. Indeed, the affidavit in this case indicated that the detective was "fully familiar with the facts and circumstances" he avowed to support probable cause. On the record before us, then, the record amply supports the trial court's conclusion that the above misrepresentations and omissions constituted reckless disregard for the accuracy of the affidavit. We therefore conclude that all three *Brown* factors corroborate our conclusion, including the most important, the flagrancy of the underlying unconstitutional conduct.

¶26 Notably, the *Brown* test and its Supreme Court progeny address attenuation in the context of a confession subsequent to an illegal

---

[6]Two other individuals the detective interviewed had also identified O.V. as the possible shooter.

[7]The investigating detective read a portion of the transcript of his interview with O.V. into the record at the suppression hearing. During the interview, O.V. stated that he did not know why he had mentioned Scott, only that Scott's was "the name [O.V. had] heard in that neighborhood a lot." The detective then agreed that O.V. had no personal knowledge of Scott having been involved.

[8]The detective was well aware of this fact. Indeed, he had seen the GPS evidence on Scott's phone while standing in the front yard of Scott's residence.

arrest. As the Ninth and Fifth Circuits and the primary treatise on criminal procedure have acknowledged, other relevant factors emerge "when a confession follows an illegal search rather than an illegal detention." *Shetler*, 665 F.3d at 1157; 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(c) (6th ed. 2022).[9] Specifically, *Shetler* identified two additional "relevant considerations": (1) whether the interrogating officer questioned the suspect about the illegally seized evidence; and (2) whether the suspect's answers might have been influenced by his knowledge that such evidence had been collected. 665 F.3d at 1158-59. During the interrogation, the detective confronted Scott with the product of the illegally seized evidence, and Scott's answers demonstrate that he was pivotally influenced by it.

¶27 Thus, whether we apply the original *Wong Sun* test, the *Brown* attenuation test, or additional criteria more tailored to confessions subsequent to illegal searches, we reach the same conclusion. The state directly exploited its illegally seized evidence, and that exploitation directly caused Scott's confession. *See Wong Sun*, 371 U.S. at 488.

**The Dissent**

¶28 The exclusionary rule makes the promise of the Fourth Amendment—that no warrants shall issue for a search "but upon probable cause, supported by Oath"—more than an aspiration to be circumvented at the whim of an aggressive investigating officer. As our dissenting

---

[9]In an unpublished opinion, the Fifth Circuit has similarly noted that the analysis applicable to illegal detentions differs from that applicable to illegal searches because "the causal link between the search and the statement can be harder to identify." *United States v. Beene*, 733 Fed. Appx. 740, 750-51 (5th Cir. 2018); *see* Ariz. R. Sup. Ct. 111(d) (citation of extrajurisdictional dispositions permissible as permitted in source jurisdiction and consistent with Rule 111(c)(1)(C), for persuasive value); 5th Cir. R. 47.5.4 (unpublished opinions issued after 1996); Fed. R. App. P. 32.1(a) (citation of unpublished federal dispositions). In addition to the two *Shetler* factors, the Fifth Circuit also identified as potentially relevant factors: (1) what evidence law enforcement had already gathered against a suspect before the illegal search; and (2) "what evidence the illegal search produces." *Beene*, 733 Fed. Appx. at 751. As the Fifth Circuit reasoned, "the ultimate question remains the same: would the statement have been obtained regardless of the illegality?" *Id.* Here, of course, the answer to that question is "No."

colleague correctly observes, our courts have also recognized the costs of the exclusionary rule. The Fourth Amendment therefore requires suppression of evidence only when the deterrence benefits outweigh those costs. In the abstract, reasonable minds can differ as to how our society should value and weigh those competing interests as to the indirect evidentiary fruits of an illegality. But this court is not at liberty to conduct that calculus anew. Rather, the United States Supreme Court has set forth manageable standards that determine whether evidence that has been acquired by exploitation of other illegally secured evidence should be suppressed. Our duty is to apply those standards.

¶29　　　The dissent parts ways with our reasoning in several respects that merit a comprehensive response. In essence, the dissent contends that an officer's recklessness in securing a search warrant fails to justify a finding of flagrancy under the *Brown* test for suppressing the warrant's indirect fruits. But we are duty-bound to follow the controlling jurisprudence of the United States Supreme Court in how we assess that question. In applying the *Brown* test, Chief Justice Roberts expressly clarified the level of underlying police misconduct compelling suppression of evidence as fruit of the poisonous tree: "As laid out in our cases, the exclusionary rule serves to deter deliberate, *reckless*, or grossly negligent conduct . . . ." *Herring*, 555 U.S. at 144 (emphasis added). Indeed, the Supreme Court has repeatedly held that such reckless conduct justifies the application of the exclusionary rule. The Court has so held both in the context of search warrant affidavits and in determining whether to suppress the indirect fruits of an officer's misbehavior. *See, e.g.*, *id.* (fruit of poisonous tree); *Franks*, 438 U.S. at 171-72 (search warrant affidavit); *Leon*, 468 U.S. at 923 (same); *Davis*, 564 U.S. at 238, 235 (automobile search incident to arrest). Thus, to the extent the dissent maintains that a showing of intentional or purposeful police misconduct should be necessary to justify exclusion of evidence "down the causal chain" of the initial illegality, its reasoning contradicts our settled standards for addressing the admissibility of such evidence.

¶30　　　Even assuming that, in an individual case, an especially mitigated form of recklessness could be an insufficient basis to trigger the deterrence purpose of the exclusionary rule under the *Brown* test, *see, e.g.*, *United States v. Yorgensen*, 845 F.3d. 908, 915 (8th Cir. 2017) (insufficient flagrancy when district court's finding of inexperienced young officer's recklessness insufficient when it amounted to no more than unreasonable mistake); *but see Herring*, 555 U.S. at 144 (gross negligence sufficient flagrancy to trigger exclusion), we cannot agree that the detective's behavior here would fit that description. In the affidavit under oath, the detective presented two bases for probable cause. Both were misleading.

The vast factual gap between the detective's avowal (numerous witnesses mentioning Scott as "being the person who shot [A.C.]") and the actual evidence collected (a single motivated witness, not present at the incident, offering only neighborhood street rumor), cannot be plausibly explained as the product of mere semantic imprecision, or a naïve officer's misunderstanding of his investigative capabilities. Rather, the detective displayed a more robust recklessness calling for the deterrent effect of suppression as a remedy under the *Brown/Herring* standard.

¶31 To the extent the dissent argues that mere suppression of the direct fruits of the police misconduct should suffice to deter future misconduct, its reasoning is at odds with the fruit of the poisonous tree doctrine itself. *See, e.g.*, *Wong Sun*, 371 U.S. at 484-85 (holding exclusionary rule "extends as well to the indirect as the direct products of such invasions," reasoning that the "essence of a provision forbidding the acquisition of evidence . . . is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all" (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920))). That doctrine exists precisely to avoid incentivizing illegal investigative strategies that can ultimately reward law enforcement with other evidence leading to a conviction.

¶32 In this case, the state and the detective could, without detriment to their case, forfeit the DNA evidence (that suggested Scott had, at some point, touched the casings discovered at the scene) for Scott's confession to having shot the victim. On the record before us, the illegally obtained DNA evidence was the lever used both to secure a custodial interrogation and to trigger the confession during that interrogation. With the confession unsuppressed, the detective's misconduct was rewarded because it effectively achieved his investigative goals—the defendant's conviction. Thus, the deterrent effect of merely suppressing the DNA evidence appears questionable in this very case.

¶33 Our colleague also maintains that the detective's misconduct is mitigated by the fact he could have provided sufficient probable cause to secure a lawful warrant. But, when determining whether to suppress evidence in the context of an illegally-obtained search warrant—as distinguished from a wrongful arrest—that is not the criteria employed in our controlling jurisprudence. When, as here, an officer provides to the magistrate substantially inaccurate facts supporting probable cause, the exclusionary rule applies if: (1) the officer's inaccurate presentation was intentional, reckless, or grossly negligent; and (2) after redacting the inaccurate information from the affidavit, the remaining facts would not

support probable cause to issue the warrant. *See Franks*, 438 U.S. at 156, 171-72; *Herring*, 555 U.S. at 144-45; *Davis*, 564 U.S. at 238 (same); *cf. Shetler*, 665 F.3d at 1157 ("Although the presence of probable cause may generally be the 'dispositive' issue in determining whether a confession stemming from an illegal *detention* should be suppressed, . . . '[t]he analysis that applies to illegal detentions differs from that applied to illegal searches.'") (alteration in *Shetler*) (quoting *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004)). In short, the Supreme Court has set forth the criteria for determining whether evidence must be suppressed under the circumstances here. Whether an officer *could have* provided accurate information sufficient to support probable cause is not among them.

¶34 Sound logic supports this approach in the warrant context. The Fourth Amendment requires not only that the state possess probable cause to search a person, but also that a neutral magistrate determine whether such cause exists. *See Franks*, 438 U.S. at 164-65 ("The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search," and "it is the magistrate who must determine independently whether there is probable cause."). For that regime to function, judicial officers must receive accurate information. *Cf. Aguilar v. Texas*, 378 U.S. 108, 109 n.1 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention."). If officers could recklessly present flagrantly inaccurate affidavits without consequence to their subsequent investigations—so long as they believe they have or may eventually have probable cause—the independent assessment of the "neutral magistrate" would become little more than a rubber stamp for aggressive detectives.

¶35 As the dissent correctly observes, the trial court did opine that the detective possessed sufficient evidence that he could have secured a lawful warrant. But, even assuming that we should be reluctant to suppress the fruits of an unlawfully acquired search warrant when the state possesses evidence sufficient to show probable cause, we are skeptical that the detective possessed such information. *See Buccini*, 167 Ariz. at 555-56, 558 (existence of probable cause mixed question of law and fact reviewed de novo on appeal). Accepting, as the trial court did, the veracity of the testimony at the suppression hearing, but shorn of the exaggerations in the detective's search warrant affidavit, the investigation had discovered little more than a neighborhood rumor as to the identity of A.C.'s enemies, one of whom was Scott. *See Dunaway v. New York*, 442 U.S. 200, 213 (1979) ("common rumor . . . was not adequate to support a warrant for arrest")

(quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)); *see also United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (same). Further, when probable cause is so debatable, officers might have their greatest temptation to exaggerate when seeking a warrant. Under that circumstance, the specter of suppression serves an indispensable role in encouraging exactingly accurate affidavits. *See Dunaway*, 442 U.S. at 218 ("When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts.").

¶36        Lastly, the dissent raises the novel contention that, because officers are generally entitled to be untruthful when interrogating suspects, they ought similarly be entitled to truthfully marshal unlawfully acquired evidence to secure a confession. In the same vein, the state argues on appeal that "because police are permitted to lie about the existence of physical evidence to obtain a confession, the provenance of any actual physical evidence cannot make a confession involuntary."

¶37        But we can find no jurisprudence that authorizes us to overlook an officer's direct exploitation of illegally seized evidence to secure other evidence, simply because the officer hypothetically possessed lawful investigative strategies that could have been equally effective. Rather, we must draw our conclusions based on the actual facts of the case before us. The improper search did occur. The detective served Scott with the search warrant and swabbed his mouth for buccal cells. To Scott, this necessarily strengthened the credibility of the detective's later, truthful claim that DNA evidence linked Scott to the shooting. Thus, the illegally secured evidence gave the detective a lever far more persuasive than a mere fabricated assertion that such DNA evidence existed. *See Shetler*, 665 F.3d at 1158 (in considering evidence collected as product of illegal search, "the answers the suspect gives to officials questioning him may be influenced by his knowledge that the officials had already seized certain evidence" and that knowledge could tend to induce confession by demonstrating futility of remaining silent). We decline to speculate whether Scott would have similarly confessed if the officer had instead conducted no illegal search but merely claimed he had secured such evidence. Nor can we overlook that, absent the unlawful search, the detective lacked a sufficient basis to secure a custodial interrogation in the first instance.

¶38        As our own supreme court has observed, our controlling inquiry here is whether the confession was procured by exploitation of an illegality—not whether an officer's interrogation strategy itself was lawful.

*See State v. Reffitt*, 145 Ariz. 452, 457-59 (1985) (voluntariness necessary but not sufficient condition of admitting confession acquired after illegal arrest: controlling inquiry is whether confession was procured by exploitation of unlawful invasion). Thus, the detective's entitlement to lie, a factor arguably relevant to a voluntariness analysis, does not bear on whether, on the record before us, the detective exploited the DNA evidence to acquire those admissions.

¶39 Finally, the state's argument would always foreclose the fruit of the poisonous tree doctrine when the state has marshalled illegally obtained physical evidence to secure a confession. This is because, in every case, the officers could have hypothetically instead lied about the state's evidence during the interrogation instead of conducting an illegal search. Such a precedent would reward officers for conducting illegal searches, secure in the knowledge that they could exploit the fruits of those searches to induce case-resolving confessions, even if the physical evidence itself is ultimately suppressed. The fruit of the poisonous tree doctrine exists to prevent this very practice. *See Franks*, 438 U.S. at 168 (refusing to "denude the probable-cause requirement of all real meaning").

¶40 In sum, the trial court found that the detective had acted recklessly in providing false and misleading evidence against Scott to secure a search warrant for his buccal swabs. In fact, the affidavit demonstrates that the evidence offered to support probable cause was *entirely* of this variety. And the record unambiguously demonstrates that the state directly exploited the fruits of that illegality both to secure an indictment justifying arrest, then to secure Scott's admissions upon that arrest. If we are to take seriously the Supreme Court's direction that the exclusionary rule prohibits "exploitation of the illegality" of a search, *Brown*, 422 U.S. at 599-600, then the facts of this case compel suppression not only of the DNA evidence itself, but also of Scott's inculpatory statements, acquired through the unattenuated use of that illegally acquired evidence.

**Disposition**

¶41 We therefore vacate Scott's convictions and sentences, and remand this matter to the trial court for further proceedings consistent with this opinion.

C A T T A N I, Judge, dissenting:

¶42 The Majority acknowledges the "heavy toll" that suppression exacts and correctly recites the principle that suppression must be applied so that its "deterrence benefits . . . outweigh its heavy costs." *See supra* ¶ 21 (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)). In my view, however, the Majority's application of the doctrine here stretches suppression beyond that point. Accordingly, and for reasons that follow, I respectfully dissent.

¶43 This case involves a single constitutional violation: a detective's reckless misstatement of fact in the warrant affidavit submitted to obtain buccal swabs from Scott. The superior court assessed the deficient affidavit and addressed the violation by suppressing the DNA evidence derived from the buccal swab. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). But in so ruling, the court also found that the deficient affidavit underlying the search warrant was not the result of intentional misconduct by law enforcement, a finding to which we defer. *See State v. Buccini*, 167 Ariz. 550, 554 (1991). And the court observed that a more carefully drafted affidavit—based only on information known to the detective at the time—*would* have supported a finding of probable cause for the search.

¶44 The question here is not whether there was a constitutional violation that required suppression of evidence. There was such a violation, and the superior court did precisely what was required under *Franks* by suppressing the DNA evidence. But contrary to the Majority's reasoning, nothing further was required to remedy the constitutional violation or to further deter future misconduct. *See Brown v. Illinois*, 422 U.S. 590, 599-600 (1975) (describing the purpose of suppression as "to prevent, not to repair").

¶45 Under *Brown*, in assessing whether to suppress evidence beyond what was seized unconstitutionally, we consider (1) the "temporal proximity" of the illegality and acquisition of the evidence sought to be suppressed, (2) the existence of any "intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 603-04. Of those factors, the flagrancy of the misconduct is "particularly" relevant. *Id.* at 604; *see also State v. Reffitt*, 145 Ariz. 452, 459-60 (1985) (noting that among the *Brown* factors, flagrancy of official misconduct "is entitled to special weight"). And here, an analysis of these factors supports the superior court's conclusion that suppression of Scott's confession (an assertion that he was acting in self-defense) was not required.

¶46　　　　First, as to temporal proximity, there was a three-month gap between the illegal search and Scott's eventual confession, which weighs against suppression. This timing suggests even more attenuation than, for example, a confession the United States Supreme Court deemed admissible in *Wong Sun v. United States*, 371 U.S. 471 (1963). There, the Court held that when a defendant, although initially unlawfully detained, had been released from custody and ultimately confessed several days later when questioned voluntarily, "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" *Id.* at 491 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also Brown*, 422 U.S. at 604 (affirming suppression when less than two hours elapsed between law enforcement's illegal conduct and a subsequently obtained confession); *Reffitt*, 145 Ariz. at 459 (collecting cases and noting that a delay of mere hours between illegality and confession would often—but not always—weigh in favor of suppression).

¶47　　　　The Majority posits that the time-lapse factor under *Brown* weighs in favor of suppression because Scott confessed almost immediately after the detective told Scott that his DNA matched genetic material found on shell casings at the crime scene. *See supra* ¶¶ 16-18. Scott likewise asserts that his circumstances meet the immediacy factor under *Brown* because he was "directly confronted" with the DNA evidence during the interview. But the United States Supreme Court has recognized that there is a significant difference between questioning a defendant during or immediately after a constitutionally improper search, and questioning a defendant several months after the improper search. *See Wong Sun*, 371 U.S. at 486-87, 491 (suppressing confession obtained from one defendant *during* an illegal search and seizure, while approving the admission in evidence of a second defendant's confession obtained *several days after* the constitutional violation). Neither Scott nor the Majority suggests that confronting and questioning a *Mirandized* defendant is an independent constitutional violation absent involuntariness, and they do not cite any authority suggesting that the time-lapse factor under *Brown* is measured from anything other than the date of the constitutional violation. Nor am I aware of any such authority.

¶48　　　　Second, as to intervening circumstances, I find compelling the superior court's finding that, faulty warrant affidavit aside, the detective had information available at the time of the search that would have sufficed to establish probable cause.[10] This, too, weighs against suppression. *See*

_____

[10] The Majority attempts to undermine the superior court's discretionary probable cause assessment, suggesting that GPS evidence

*Reffitt*, 145 Ariz. at 459. Although the Majority suggests existence of probable cause for the initial search is not germane to the analysis, *see supra* ¶¶ 35, 37, our own supreme court has observed that the existence of probable cause at the time of the initial illegality may be "one such intervening factor that tends to break the chain of causation between the illegal [conduct] and the confession." *Reffitt*, 145 Ariz. at 459; *see also id.* at 459-60 (collecting cases to that effect from multiple jurisdictions). Notably, the key authorities on which the Majority relies involved cases in which law enforcement officers neither sought a warrant *nor had probable cause to support any such request. See, e.g., Wong Sun*, 371 U.S. at 481-82, 491; *Brown*, 422 U.S. at 592.[11]

¶49        Finally, as to the purpose and flagrancy of the underlying official misconduct, the detective's reckless—*not* intentional—misstatement in the warrant affidavit (an affidavit in which the detective included exculpatory information as well) falls far short of flagrant, which likewise weighs against suppression. *See, e.g., Wong Sun*, 371 U.S. at 479-81 (arrest based on "mere suspicion"); *Brown*, 422 U.S. at 605 (relying heavily on the lack of probable cause underlying officials' actions taken "in the hope that something might turn up" in finding purposeful and flagrant misconduct); *Dunaway v. New York*, 442 U.S. 200, 218 (1979) (similar); *Taylor v. Alabama*, 457 U.S. 687, 693 (1982) (similar). The Majority offers its view that "the detective displayed a more robust recklessness calling for the deterrent effect of suppression as a remedy." *See supra* ¶ 30. But the Majority has simply substituted its own factual assessment for that of the superior court, which is beyond our purview on appeal. *See Buccini*, 167 Ariz. at 554.

---

showing Scott was in the vicinity when the shooting occurred "did little to implicate [Scott] in the crime" because Scott lived nearby. *See supra* ¶ 24. But even if Scott might have had other reasons to be in the area, the GPS evidence nevertheless tended to show that he was, in fact, in the area at the time of the shooting and the evidence was thus relevant to the probable cause analysis.

[11]The Majority also relies on the non-binding Ninth Circuit decision in *United States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011). But *Shetler*, like *Wong Sun* and *Brown*, involved a warrantless search, and the confession in that case was elicited shortly after the illegal search. *Id.* at 1154-55. And unlike here, the *Shetler* court found that there was "flagrant misconduct" by law enforcement officers. *Id.* at 1160.

¶50 The reckless falsehood in the warrant affidavit justified suppression of the evidence gathered on execution of the resulting invalid warrant. *See State v. Nordstrom*, 200 Ariz. 229, 245, ¶ 42 (2001), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 243, ¶ 20 (2012). But when the underlying constitutional violation is based on a mistake (albeit a reckless one) rather than *intentional* misconduct, the deterrent effect of suppressing a confession this far down the causal chain decreases precipitously.

¶51 The deterrence link here is especially tenuous because, rather than go through the rigmarole of recklessly falsifying a warrant affidavit to gather DNA evidence with which to confront a suspect, the police could simply—and permissibly—*lie about having a DNA match*. *See State v. Huerstel*, 206 Ariz. 93, 106, ¶ 54 (2003) (noting that a confession may be obtained by lying about the existence of physical evidence if the suspect's will has not been overborne) (citing *State v. Carrillo*, 156 Ariz. 125, 136 (1988)). And here, if law enforcement officers had arrested Scott without a warrant but with probable cause, and during a *Mirandized* interview had falsely told him that DNA evidence linked him to the crime, his response presumably would have been admissible. The detective did not "exploit" an illegal search by attempting to elicit a contemporaneous confession; rather, after three months passed from the improper search, the detective exploited Scott's knowledge that he had been at the crime scene by truthfully telling him there was biological evidence linking him to the crime.

¶52 Finally, the majority posits that declining to suppress Scott's statement essentially "rewards[s] officers for conducting illegal searches, secure in the knowledge that they [can] exploit the fruits of those searches to induce case-resolving confessions, even if the physical evidence itself is ultimately suppressed." *Supra* ¶ 39. But the majority's argument seems to presuppose *intentional* misconduct.

¶53 Here, the constitutional violation was a reckless misstatement in an affidavit seeking a warrant. There was probable cause to obtain a warrant, and a more carefully drafted affidavit would have supported the issuance of a warrant. Under these circumstances, I am unpersuaded that the detective's actions constitute flagrant misconduct designed to induce a case-resolving confession.

¶54 In sum, an analysis of the *Brown* factors—including most significantly the alleged "flagrancy" of the detective's misconduct—weighs heavily against suppression of Scott's confession. Although the exclusionary rule serves a valuable purpose in deterring constitutional

violations, it imposes a great cost by excluding reliable evidence and undermining faith in the judicial system if it is applied without substantial basis. And here, given the superior court's express finding that the detective did not intentionally mislead the magistrate in seeking a warrant, application of the exclusionary rule to suppress anything beyond the DNA evidence obtained under the warrant was not justified. Accordingly, I would affirm the superior court's ruling admitting in evidence Scott's statement to law enforcement officers.